## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### BID PROTEST

| | |
|---|---|
| FYI - FOR YOUR INFORMATION, INC., )<br><br>Plaintiff, )<br><br>v. )<br><br>THE UNITED STATES OF AMERICA, )<br><br>Defendant. ) | Case No. _____<br><br>██████████████<br><br>█████████████████<br>REDACTED COPY 1-26-26 |

## ███████ BID PROTEST COMPLAINT

Plaintiff FYI - For Your Information, Inc. ("FYI"), by its undersigned counsel, submits this post-award Bid Protest Complaint. This bid protest Complaint challenges a United States Department of Justice, Drug Enforcement Administration ("DEA" or the "Agency") decision to award a Blanket Purchase Agreement ("BPA") to C Evans Consulting, LLC ("CEC") under Solicitation No. 15DDHQ25Q00000051 (the "Solicitation" or "RFQ"). The DEA procurement seeks Human Capital Support Services from a Woman Owned Small Business ("WOSB").

## I.    INTRODUCTION

1.    By the RFQ, the DEA Human Resources Division seeks "Human Capital Support Services capable of sustaining DEA mission and staff." (GAO AR Tab 4 (Part 2), RFQ Am. 1 at PDF 137.)[1] FYI has provided these services to DEA since 2015 ███████████████

---

[1] FYI has cited to documents from the preceding U.S. Government Accountability Office bid protest. *FYI – For Your Information, Inc.*, B-423774.1, B-423774.2. These documents include the FYI protest and the Record that the DEA produced at GAO. Appendix C to the U.S. Court of Federal Claims ("COFC") rules directs the Agency to include the cited records as part of the Administrative Record in this case. RCFC App. C, ¶ 22.

████████████████████████████████████

2.     Consistent with its years of successful experience and intimate familiarity with DEA's human resources needs, FYI submitted a robust, highly competitive quote. In fact, even with the many prejudicial errors identified herein, FYI's quote received the highest adjectival ratings under each of the non-price factors and offered a lower price than CEC. The DEA evaluation record, however, reveals that the Agency selected CEC for award (notwithstanding FYI's comparable ratings and lower price) based on material errors that render the Agency's evaluation and best value determination (which fails in its own right) arbitrary and capricious.

3.     First, the Agency misevaluated and unequally evaluated the quoters under Factor 1 (Technical Capabilities), the most important evaluation factor. The RFQ commits the Agency to evaluate under this Factor the quoter's capability to perform the tasks in the statement of work ("SOW"), as measured by the quoter's "relative merit." In apparent disregard of this requirement, the Agency identified two CEC Factor 1 benefits which supposedly "exceed requirements" and function as CEC award discriminators versus FYI. Yet neither of these supposed benefits reflect a relative CEC advantage over FYI. Initially, the Agency found that CEC has demonstrated the ability to exceed the RFQ metric for responding to applicant inquiries. But CEC never proposed to exceed this metric; CEC merely stated ███████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████ It is FYI, if anything, that ████████████████████████████████ of responding to applicant inquiries. Additionally, the Agency errantly credited CEC's use of customized dashboards in transition as a discriminator in CEC's favor versus FYI, despite recognizing that ██████████████████████ █████████████████ Although CEC's use of dashboards in transition might reflect an advantage

(and lowered risk) versus ██████████████, it cannot possibly represent an advantage versus a quoter (FYI) that ████████████████

4.      The Agency, under Factor 1 (Technical Capabilities) further undermined FYI's competitive standing by admittedly withholding evaluation credit from aspects of FYI's approach that exceeded the stated metrics once it determined that FYI merited a High Confidence rating. In doing so, the Agency departed from the RFQ requirement to assess the quoters on their full relative merit. The Agency also did not equally hold the quoters to this apparent standard, as it readily recognized CEC quote features which purportedly exceeded requirements, even where CEC did not actually propose to exceed any metric. The Agency further subjected the quoters to disparate treatment by crediting CEC only for substantially similar (or even superior) attributes of FYI's approach.

5.      Second, the Agency also unreasonably and unequally evaluated quoters under Factor 2 (Transition Phase-In/Transition Phase-Out). Referring to the transition as an "integral part of the start-up," the RFQ commits the Agency to focus its evaluation on the quoter's ability to implement transition within 30 days "without impacting the operations of the program during the phase-in and phase-out periods during contract performance." FYI, █████████████████ ████████████████████████████████████ and even ████████████ ██████████████████████████████████████ CEC could not match (and has not matched) these unique FYI transition advantages. But the Agency failed to distinguish quoters on their relative merit, as the RFQ requires. Instead, the Agency admitted assigning any quoter which met the requirements a High Confidence rating. As a direct result, the Agency errantly viewed CEC quote features which, at best, meet the minimum requirements as equivalent to FYI's features which substantially exceed the requirements. The DEA further

masked FYI's superiority by crediting specific aspects of CEC's transition while ignoring virtually identical (or even more meritorious) aspects of FYI's approach.

6.    Third, the Agency's evaluation relative to Factor 3 (Past Performance) similarly reflects an irrational evaluation premised on an errant view of the quoters' relative merits. The RFQ commits the DEA to assess the quoters' capability to provide services with similar scope, magnitude, and complexity to that stated in the SOW. As the ███████████████████ ███████████████████████████████████. Indeed, as recently as ███████████████████████████ the Agency issued a Contracting Performance Assessment Report ("CPAR") that ███████████████████ ███████████████████████ Although the evaluators reviewed quoters' CPAR reports as part of the evaluation for the BPA, the Agency conceded it did not review its own CPAR issued to FYI under the incumbent effort because the report purportedly was unavailable on the Contractor Performance Assessment Reporting System ("CPARS"). Setting aside the fact that the only reason the DEA could not obtain the report from CPARS was due to its own failure to comply with the FAR, the DEA evaluators ███████████████████ ███████████████ had access to the report and had an obligation to consider it. Had the Agency considered its ███████████, official assessment of FYI's performance on necessarily the most relevant past effort, the evaluators ███████████████████ ███████████████████████ The Agency further skewed the quoters' relative merits by recognizing CEC's ███████████████ across the ███████████ while failing to mention that FYI ███████████████ ███████████

███████████████████████████

7.      Fourth and finally, the Agency's best value determination contravenes the RFQ, the FAR, and the APA.  Even under procurements conducted pursuant to FAR Part 8, procuring agencies must conduct a price/technical tradeoff and rationally explain why a quotation's technical superiority merits a higher price.  In addition, the APA requires that agencies set forth their evaluation determinations (to include best value determinations) with sufficient clarity to permit effective judicial review.  The DEA's one-sentence tradeoff, in which the source selection authority ("SSA") merely concludes without any explanation that CEC's "exceed requirements" findings warrant a price premium, fails against the foregoing requirements.  The provided explanation neither conveys that the DEA comparatively assessed quoters, nor explains why the Agency viewed CEC's "exceed requirements" notations of benefit.  The FAR, the APA, and RFQ (which expressly requires the Agency to distinguish among the quoters) require more.  Equally problematic, the deficient tradeoff analysis ignores the finding that ████████████████ ████████████████████████████████████████████  As such, the DEA has ignored relevant information necessary to reach a sound tradeoff conclusion and cannot pass muster under the APA standard of review.  And, even if the best value decision did not fail in its own right (it does), the best value decision derives from numerous underlying evaluation errors that render the decision flawed and undermine the award to CEC.

## II.    PARTIES

8.      FYI is a woman-owned small business dedicated to providing federal agencies with the human resources and information technology solutions they need to meet and exceed their goals.  With nearly four decades of highly relevant experience, FYI serves as the incumbent on the present effort.  FYI submitted a robust quote for the solicited effort informed by its deep familiarity

with the DEA's human resources and staffing needs.  With the fair and evenhanded evaluation that the RFQ and procurement law mandate, the DEA would have selected FYI for award.

9.      The DEA is a federal law enforcement agency tasked with enforcing the controlled substances laws of the United States.  The DEA Human Resources Division ("HRD") supports the mission by "developing and implementing policy and programs, providing guidance, and leading efforts to attract, develop, and retain high performing employees."  (GAO AR Tab 4 (Part 2), RFQ Am. 1 at PDF 148.)

10.      CEC, the awardee, is a company that provides human capital management and human resources operations in the federal and commercial sectors.[2]

## III.    JURISDICTION AND VENUE

11.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1491(b); *Sys. Appl'n & Tech., Inc. v. United States*, 691 F.3d 1364, 1380-81 (Fed. Cir. 2012) (affirming section 1491(b)'s "broad grant of jurisdiction," and stating that, "[o]n its face, the statute grants jurisdiction over objections to a solicitation, objections to a proposed award, objections to an award, and objections related to a statutory or regulatory violation so long as these objections are in connection with a procurement or a proposed procurement"); *Res. Conservation Grp., LLC v. United States*, 597 F.3d 1238, 1244 (Fed. Cir. 2010) (explaining that the phrase procurement or proposed procurement as used in section 1491(b) "includes all stages of the process of acquiring goods or services.").

12.      Venue is appropriate in this Court pursuant to 28 U.S.C. § 1491.

---

[2] https://www.linkedin.com/company/cevans-consulting/.

## IV.   STANDING

13.      FYI is an interested party to bring this protest because it is an actual offeror that timely submitted its quote and, but for the Agency's errors, would have had a substantial chance at receiving the contract award.

14.      The Tucker Act states that this Court "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b).

15.      Although the Tucker Act does not define "interested party," the Federal Circuit has held that, in the post-award context, "interested party" means "a party with a substantial chance of securing the award." *CACI, Inc.-Fed. v. United States*, 67 F.4th 1145, 1152 (Fed. Cir. 2023).  The Federal Circuit has explained that a protester satisfies this requirement if it has "greater than an insubstantial chance of securing the contract if successful on the merits of the bid protest." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (2003).

16.      Whether a plaintiff has standing under the Tucker Act presents a question of statutory standing that does not implicate the Court's subject matter jurisdiction. *CACI,* 67 F.4th at 1151 ("Our prior caselaw treating the interested party issue as a jurisdictional issue . . . is no longer good law in this respect. The Claims Court here erred in treating the issue of statutory standing as jurisdictional.").

## V.    FACTUAL ALLEGATIONS

### A.    Procurement Overview

17.    The DEA issued the Solicitation on May 2, 2025 and subsequently posted three amendments.  Amendment 1 contains the Agency's questions and answers ("Q&A") with quoters and reflects modifications to the RFQ in response to vendor questions.  Amendment 2 clarifies DEA's response to a single vendor question without making any substantive RFQ revisions.  Amendment 3 also clarifies DEA's response to a single quoter question and makes slight adjustments to the RFQ's instructions.[3]

18.    The Solicitation, issued as a WOSB set-aside (GAO AR Tab 4 (Part 2), RFQ Am. 1 at PDF 142), seeks to award a single Time and Materials (T&M)/Labor Hour (LH) blanket purchase agreement using the selected vendor's General Services Administration ("GSA") federal supply schedule ("FSS").  (GAO AR Tab 4 (Part 2), RFQ Am. 1 at PDF 170.)

19.    DEA assigned the following NAICS codes to the procurement:  (i) 541611 (Administrative Management and General Management Consulting Services); and (ii) 541612 (Human Resources Consulting Services).  (*Id*. at PDF 178.)

20.    By the Solicitation, the DEA Human Resources Division "requires Human Capital Support Services capable of sustaining DEA mission and staff."  (*Id*. at PDF 137.)  Key tasks include, at a high level: "Operational recruitment and staffing, classification activities, personnel processing, general administrative, and program/project support activities." (*Id*.)  To that end, the selected contractor must support six distinct "Task Areas":

---

[3] Unless otherwise stated, all references herein to the "Solicitation" or "RFQ" refer to RFQ Amendment 1.

- Task Area 1: Operational Recruitment and Staffing Activities
- Task Area 2: Operational Classification Activities
- Task Area 3: Operational Personnel Processing Activities
- Task Area 4: Operational Benefits Activities
- Task Area 5: Operational General Administrative Activities
- Task Area 6: Operational Program/Project Support Activities

(*Id*. at PDF 149.)

21.     The RFQ contemplates that the level of effort required to carry out the assigned duties will require approximately 10-35 positions.  (*Id*. at PDF 163.)  The RFQ establishes the following labor categories, each of which sets forth minimum education, skills, and experience requirements: Program Support Specialist; Administrative Assistant II; Administrative Assistant II (Medical)/Technician; and Administrative Assistant I.  (*Id*. at PDF 163-164.)  In addition, the RFQ establishes, along with minimum education, experience, and skills requirements for each, the following key personnel positions: Program Manager; Senior Recruiter/Sr. HR Specialist; HR Specialist Jr./Technical Specialist; Human Resources Assistant; Classification Specialist; Project Specialist; and Program Analyst.  (*Id*. at PDF 164-165.)

### 1.     Quotation Submission Instructions

22.     The Solicitation instructs quoters to submit quotes in two volumes: Volume I – Technical Quote and Volume II – Business Quote.  (*Id*. at PDF 173.)

23.     Volume I (Technical Quote) covers three Factors: (1) Factor 1 – Technical Capability; (2) Factor 2 – Transition Phase-In / Transition Phase-Out; and (3) Factor 3 – Past Performance.  (*Id*. at PDF 175.)

24.     Under Factor 1 – Technical Capability, each quoter must demonstrate its ability to satisfy or accomplish each of the statement of work ("SOW") tasks.  (*Id*.)  The Solicitation requires a detailed description of the quoter's technical capability.  In addition, the Solicitation instructs:

> ➢ The Quoter's quote shall demonstrate the ability to deliver qualified personnel to meet evolving agency needs. The Quoter's quote shall include the title of the labor category, job description and education, HR professional experience that best represents the Government's minimum requirement as stated in the RFQ.

> ➢ The Quoter's quote shall demonstrate their capability as an organization to satisfy the tasks specified in the SOW at a corporate level.

> ➢ The Quoter's quote shall demonstrate the understanding of federal human resource law, regulations, and policies.

> ➢ The Quoter's quote shall demonstrate the ability to provide high-volume recruitment and onboarding support under tight deadlines.

> ➢ The Quoter's quote shall demonstrate the ability to develop tools to monitor performance and deliverables effectively.

(*Id.*)

25.    Under Factor 2 – Transition Phase-In /Transition Phase-Out, the Solicitation calls on each quoters to demonstrate its ability to implement a transition plan without impact to operations.  (*Id.*)  Factor 2 includes two subfactors – Subfactor 1 (Transition Phase-In) and Subfactor 2 (Transition Phase-Out).  (*Id.* at PDF 175-176.)  As to Factor 2, Subfactor 1 (Transition Phase-In), the Solicitation indicates that "[t]ransition is an integral part of the startup," and, in turn, obligates the quoter to "transition in accordance with its timeline to complete all phase-in activities within 30 days of the effective date of the award."  (*Id.* at PDF 175.)  The quoter's plan for transition-in must cover the following: management of phase-in activities; initial staffing levels and timeline to achieve full staffing levels; management of knowledge transfer activities; ensuring no disruption of work and maintaining continuity of operations; transfer of government furnished property, material, equipment, and data, if applicable; and monitoring and reporting of transition process.  (*Id.* at PDF 176.)  Under Subfactor 2 (Transition Phase-Out), the RFQ instructs quoters

to provide a plan for the transition-out period, in the event that the Agency does not select the quoter for a follow-on award. (*Id.*)

26.     For technical Factor 3 (Past Performance), the Solicitation requires quoters to provide up to three successful contracts with past performance from the past three years that represent the quoter's capability to provide services "with similar scope, magnitude, and complexity to that stated in the SOW." (*Id.*). For each specific past performance example, the quoter must provide, among other things, a discussion of the similarities and differences between the solicited effort and past performance, and a brief explanation of the expectations and scope for each past performance example. (*Id.*)

27.     The Solicitation includes a schedule of supplies at RFQ Section 2, which includes each labor category CLIN (for both the base and option periods), prepopulated quantity figures, and blank entries to insert the total unit price and total amount for each CLIN. (*Id.* at PDF 143.) Under Volume II – Business Quote, the Solicitation instructs quoters to fill in the "unit price" entry for each CLIN. (*Id.* at PDF 177.) Unit prices include direct and indirect costs associated with the labor category or other services not separately priced including profit. (*Id.*) The prepopulated quantities times the inserted unit price equals the total proposed amount for each CLIN, which the Solicitation instructs the quoter to fill in. (*Id.*) The quoter must calculate its price for the base year and the 12-month option period and the combined total for the base plus option period by adding the total price for each CLIN. (*Id.*)

### 2. Evaluation Criteria

28.     As the basis for award, the Solicitation states that the Agency, using the best value/trade-off method, will "make award to the responsive, responsible Quoter whose quote is most advantageous to the Government, price and other factors considered." (*Id*. at PDF 181.) The Solicitation further clarifies that the Agency will evaluate quotes in accordance with FAR 8.405, Ordering Procedures for Federal Supply Schedules, and that the Agency will focus the evaluation on the quoter's understanding of the work, approach, potential for completing the work, and price reasonableness. (*Id*. at PDF 182.)

29.     The Solicitation explains that the Agency will conduct a technical evaluation along the three factors set forth in the instructions: Factor 1 – Technical Capability, Factor 2 – Transition Phase-In / Transition Phase-Out, and Factor 3 – Past Performance. (*Id*.)  In addition, the RFQ commits the Agency to evaluate Cost/Price "pursuant to FAR 8.4 for reasonableness, balance, and price realism at the bottom line (not cost realism)." (*Id*.)

30.     The Solicitation lists the technical factors in descending order of importance.  When combined, all non-price factors together have significantly more importance than cost/price. (*Id*.)  As technical differences among quoters narrow, however, price/cost increases in importance and if no significant technical differences exist among quoters, cost/price may become the determining factor for source selection. (*Id*.)

31.     The evaluation process for the technical factors contemplates the assessment of strengths, weaknesses, deficiencies, and risks to measure the degree to which the proposed approach meets the minimum performance and capability required. (*Id*. at PDF 183.)

32.     Importantly, the Solicitation clarifies that, rather than evaluating quoters in isolation, "[a] technical evaluation will be conducted to determine the relative merits of the Quoter's quote; in accordance with evaluation factors established by the Government prior to receipt of quotes. The technical evaluation will result in adjectival ratings." (*Id*. at PDF 182.)

33.     Relative to Factor 1 (Technical Capability), the Solicitation commits the Agency to evaluate the quoter's "technical capability to accomplish or satisfy each of the tasks in the SOW," and the quoter's understanding of the requirement, as reflected in the quoter's specificity, detail, and completeness. (*Id*. at PDF 183.) More specifically, the Agency must evaluate the quote:

- To measure the quoter's ability to provide qualified personnel to meet evolving agency needs, the title of the labor category; job description and education, HR professional experience that best represents the Government's minimum needs as stated in the RFQ;
- To ensure that the quote demonstrates the quoters' capability as an organization to satisfy the tasks specified in the SOW at a corporate level;
- To ensure that the quote demonstrates the quoter's understanding of federal human resource law, regulations, and policies;
- To gauge the extent to which the quote demonstrates an understanding by the quoter to provide high-volume recruitment and onboarding support under tight deadlines; and
- To assess whether the quote demonstrates the understanding and ability to develop tools to monitor performance and deliverables effectively.

(*Id*. at PDF 183-184.)

34.     Relative to Factor 2 (Transition Phase-In / Transition Phase-Out), the Solicitation directs the Agency to evaluate the quoter's ability to implement a transition plan without impacting operations during the phase-in and phase-out periods. (*Id*.) By Subfactor 1 (Transition Phase-In), the Agency must evaluate the quote for the quoter's ability to complete all phase-in activities within thirty (30) days of the effective date of contract award. (*Id*. at PDF 184.) By Subfactor 2 (Transition Phase-Out), the Agency must evaluate the quoter's plan for a transition-out period, in the event that the Agency does not select the quoter for a follow-on award. (*Id*.)

35.     Relative to Factor 3 (Past Performance), the Agency must assess its level of confidence in the quoter's performance based on information the Agency receives or obtains regarding the quoter's past performance during the past 3 years. (*Id.* at PDF 185.) The confidence assessment includes an evaluation of the quoter's "capability to provide services with similar scope, magnitude, and complexity to that stated in the SOW." (*Id.*)  In addition, the Solicitation clarifies that the Agency will consider additional sources of information beyond the quoter's quote, including past and present customers and employees, the government's own knowledge/experience, and sources such as contracting offices, CPARS, and PPIRS. (*Id.*)  The Solicitation further states that the Agency may obtain past performance information by contacting other federal agencies, state and local government agencies, consumer protection organizations, the Better Business Bureau, former and present subcontractors, and others who may have pertinent information. (*Id.*)

36.     For Factor 1 (Technical Capability) and Factor 2 (Transition Phase-In / Transition Phase-Out), the Solicitation instructs the Agency to assign each quoter one of the following confidence ratings:

| | |
|---|---|
| **High Confidence** | The Government has *high confidence* that the Quoter understands the requirement, proposes a sound approach, and will be successful in performing the contract with *little or no* Government intervention. |
| **Some Confidence** | The Government has *some confidence* that the Quoter understands the requirement, proposes a sound approach, and will be successful in performing the contract with *some* Government intervention. |
| **Low Confidence** | The Government has *low confidence* that the Quoter understands the requirement, proposes a sound approach, or will be successful in performing the contract *even with* Government intervention. |

(*Id.* at PDF 183.)

37.     For Factor 3 (Past Performance), the Solicitation commits the Agency to assign one of the three following adjectival ratings:

| | |
|---|---|
| **Acceptable** | The Quoter's submission demonstrates same/similar requirement, and *will be* successful in performing the contract. |
| **Unacceptable** | The Quoter's submission *does not* demonstrate same/similar requirement, and *will not be* successful in performing the contract. |
| **Neutral** | The Quoter's submission of past performance record is neither recent nor relevant and does not count favorably nor unfavorably. |

(*Id.*)

38.     For Cost/Price, the Solicitation instructs the Agency to evaluate cost/price "pursuant to FAR 8.4 for reasonableness, balance, and price realism at the bottom line (not cost realism)." (*Id.* at PDF 182.) The Agency must derive the quoter's price by adding the total price for each CLIN for the base and options periods. (*Id.*) Further, the Agency must assess price reasonableness based on the quoter's proposed price for both the base and option period. (*Id.* at PDF 177.) The Agency will deem a quote unacceptable if the quote contains significantly unbalanced option prices. (*Id.* at PDF 181.)

**B.     The Competition And Award**

39.     The Solicitation directs quotation submission no later than June 2, 2025 by 10:00am EDT. (*Id.* at PDF 142.)

40.     FYI timely submitted its quote on June 1, 2025. (FYI Tech. Quote Vol. I at 1.)

41.     On July 17, 2025, the Agency notified FYI that the Agency had not selected FYI for award and that the Agency instead selected CEC for award at a total price of $9,313,152.00. (Unsuccessful Offeror Notice at 1, Ex. A.)

42.     The award notice letter indicates that the Agency received a total of thirteen quotes in response to the Solicitation. (*Id.*) The letter reflects the following ratings for CEC and FYI:

| Quoter | Overall Ratings |
|--------|-----------------|
|        |                 |
| For Your Information, Inc. | HIGH Confidence |
| C Evans Consulting, LLC | HIGH Confidence |

(*Id.*)

43.    On July 21, 2025, the Agency provided FYI with an explanation of the basis for award.  (Basis for the Award Decision, Ex. B.)  The document confirms that FYI received (the highest) High Confidence overall rating for the Technical Quote volume and discloses the following ratings for each individual technical Factor:

FYI RATINGS BY FACTOR

| Factor | Rating |
|--------|--------|
| Factor 1: Technical Capability | High Confidence |
| Factor 2: Transition Phase-In/Transition Phase-Out | High Confidence |
| Factor 3: Past Performance | Acceptable |

(*Id.* at 2.)  The explanation for the basis of award represents that CEC also received a High Confidence for the Technical Quote Volume but did not provide the ratings CEC received for any of the three underlying Factors.

44.    As to Cost/Price, the explanation for the basis of award reveals that FYI quoted a lower price than CEC:

COST/PRICE

| Quoter | Total Cost/Price |
|--------|------------------|
| For Your Information, Inc | $9,240,633.60 |
| C Evans Consulting LLC | $9,313,152.00 |

(*Id.*)

### C.   FYI's GAO Protest and The Evaluation Record

45.   On July 28, 2025, FYI filed a protest at GAO challenging DEA's award to CEC. (FYI GAO Protest.)  FYI's protest challenged the DEA's evaluation under each of the non-price Factors (Factors 1-3) and the DEA's best value decision.  (*Id.* at *passim.*)

46.   The Agency produced its evaluation record on August 25, 2025, giving FYI insight into the DEA's evaluation and, as described in more detail below, revealing numerous procurement errors that form the basis of this protest.

47.   The DEA's record reflects that the Agency did not evaluate the quoters to determine their "relative merits," as the RFQ requires.  The Agency, rather, evaluated the quoters in isolation using an "On-the-Spot, Technical Evaluation Worksheet" under each of the non-price Factors (1-3) by noting attributes which "Raise[] the expectations of success" or "Lower[] the expectation of success," as well as "other observations" in the quoter's submission.  (*See, e.g.*, GAO AR Tab 5 (Part 3), CEC Tech. Eval. at PDF 3.)  The Agency then assigned the quoter a confidence rating for the relevant Factor.  (*Id.*)

48.   The record reveals that CEC received the same evaluation ratings as FYI under Factors 1-3:

| Factor | Rating |
|---|---|
| Factor 1 – Technical Approach | High Confidence |
| Factor 2 – Transition | High Confidence |
| Factor 3 – Past Performance | High Confidence |

(*Id.*)

49.     The Agency set forth its best value determination and award decision in a document titled "Award Decision Memo."  (GAO AR Tab 10 (Part 3), Award Decision Memo..)  In the document, the SSA ███████████████████████████████████████████████ ███████████████████ again does not comparatively assess the quoters on their relative merits. Although the SSA proclaims that she performed an "independent comparative analysis," the SSA instead notes her agreement "with the assessments and ratings assigned by the TEP to each of the technical quotes" and proceeds to summarize the Technical Evaluation Panel's ("TEP") underlying evaluation for each of the quoters[4] (in isolation) under the non-price Factors (Factors 1-3).  (*Id.* at PDF 33-37 (starting each summary with "The Technical Evaluation (TEP) thoroughly reviewed and rated the technical quote" submitted by the quoter and proceeding to identify that TEP's salutary findings for each).)

50.     For CEC, the SSA's summary notes: ████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ (*Id.* at PDF 33.)

51.     The SSA further noted that CEC ████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

---

[4] The Award Decision Memorandum reveals that of the nineteen quotes the DEA received, the DEA disqualified six due to mathematical errors in their Volume II submissions, and proceeded to evaluate the thirteen (13) remaining quoters.  (GAO AR Tab 10 (Part 3) at PDF 28, 32.)

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ (*Id.* at

PDF 33.)

52.    Although CEC proposed a higher price than FYI, the SSA concluded: ███████

████████████████████████████████████████████████████

████████████████████████ (*Id.*)

53.    For FYI, the SSA's summary states: ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ (*Id.* at PDF 35.)  The SSA summary recognizes that ████

██████████████████████████████████████████ and that FYI ███

████████████████████████████████████████████████████

████████████████████ (*Id.*)  Although the SSA ██████████████████

██████ frames the evaluator's assessment of FYI as ██████████████████

██████████ the SSA recognizes that FYI █████████████████████████

████████████ and that █████████████████████████████ (*Id.*)

Although the SSA █████████████████████████████████████

███████████████████████ the Agency considered ████████████████

████████████████████████████████████████████████████

███████████████████ (*See, e.g.. id.* at PDF 34 ████████████████

████████████████████████████

54.    Following the summary of the underlying evaluation for the quoters, the SSA set

forth the SSA's tradeoff analysis in a single sentence:

███████████████████████████████████████████████████

> The High Confidence rating of C. Evan's [sic] Consulting, LLC's quote across all
> non-price factors along with their exceeding requirements offsets the higher price
> of their quote when compared to lower priced proposals which received equal or
> lower ratings across the non-price factors

(*Id.* at PDF 45.)

55.     Once more, nothing in the provided rationale (or elsewhere in the DEA's record) suggests that the Agency evaluated quoters on their *relative* merits, as the RFQ requires, or otherwise compared the quoters to one another prior to deeming CEC's higher-priced quote as offering the best value.  As a corollary, the DEA's tradeoff disregards the finding that ██████ ████████████████████████████████████████████████████████████ ████████████████████████████████ and does not meaningfully assess FYI's price advantage.

56.     In addition to the errors on the face of the DEA's best value determination, the DEA's record reveals an irrational and unequal evaluation under each of the non-price Factors (1-3).  On the one hand, the DEA overevaluated CEC by making unwarranted findings in its favor—to include the aspects of its quote that the DEA identified as award discriminators—and crediting CEC for representations that merely satisfy the basic requirements.  Conversely, for FYI, the DEA failed to recognize or sufficiently credit attributes of FYI's quote that well surpassed the RFQ requirements or which demonstrated the same or greater proficiencies than CEC.

57.     Notwithstanding the numerous prejudicial errors on the face of the DEA's evaluation record, GAO, on December 12, 2025, denied FYI's protest.

58.     This protest promptly follows.

**COUNT I**
**The Agency's Factor 1 (Technical Capability) Evaluation Was Arbitrary, Capricious, An Abuse Of Discretion, And Otherwise Not In Accordance With Law**

59.     FYI incorporates paragraphs 1 through 58 of the Complaint by reference.

60.     The RFQ requires the Agency to conduct its technical evaluation to assess the quoters' relative merits.  (GAO AR Tab 4 (Part 2), RFP Am. 1 at PDF 182.)  Relative to Factor 1 (Technical Approach), the Agency committed to "evaluate each Quoter's technical capability to accomplish or satisfy each of the tasks in the SOW.  The Government will evaluate the Quoter's quote for specificity, detail, and completeness to clearly and fully demonstrate an understanding of the requirement."  (*Id*. at PDF 183.)

61.     The evaluation record reflects that the Agency assessed both CEC and FYI a High Confidence for Factor 1 upon an irrational and inconsistent evaluation that attributed unwarranted benefits to CEC and even treated ███████████████ as CEC award discriminators.  The Agency further obscured FYI's relative merits, in violation of the RFQ, by declining to recognize features of FYI's quote which exceeded requirements once the evaluators determined to assign FYI a "High Confidence."  And,  in addition to evaluating the quoters unreasonably, the Agency also did so unequally by assessing evaluation credit to CEC only without crediting substantially similar (or even superior) attributes of FYI's approach.  But for these glaring errors, FYI would have emerged as superior under Factor 1 (the most important evaluation Factor).  Indeed, given the DEA's apparent finding that the two unwarranted benefits it identified in CEC's quote functioned as CEC award discriminators, a correct evaluation would almost certainly have found that FYI's already comparably-rated, lower-price quote provides the best value (even without correcting any of the DEA's numerous additional evaluation errors).

21

62.     The law is clear that  "[i]f an agency's evaluation of proposals differs significantly from the process disclosed in the solicitation, the agency's decision lacks a rational basis." *Lab. Corp. of Am. Holdings v. United States*, 116 Fed. Cl. 643, 650 (2014) (citing *360Training.com, Inc. v. United States*, 106 Fed. Cl. 177, 184 (2012)); *Samsara Inc. v. United States*, 169 Fed. Cl. 311, 319 (2024) ("An agency must evaluate proposals and make awards based on the criteria stated in the solicitation") (citation omitted); *see also* FAR 8.405-3(b)(2)(vi) (requiring that the agency ensure "all quotes received are fairly considered and award is made in accordance with the basis for selection in the RFQ"). This obligation on the agency includes a requirement to evaluate quotes fairly.  *Cont'l Collection & Disposal, Inc. v. United States*, 29 Fed. Cl. 644, 652 (1993) ("To be sure, a contractor is entitled to a fair evaluation of a response to a solicitation, to be treated fairly during contract performance and to a fair evaluation of contract performance prior to termination"). Further, the FAR commands that agencies "must treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria." *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 383 (2003) (citation omitted); FAR 1.602-2. Finally, the propriety of an Agency's finding that one offeror is superior to another turns "on whether the contracting agency's judgment concerning the significance of that difference was reasonable in light of the solicitation's evaluation scheme." *Weston Sols, Inc. v. United States*, 95 Fed. Cl. 311, 328 (2010).

63.     Here, the DEA's evaluation record reflects material disconnects between the objective and reasonable evaluation that the RFQ and the law promise and the irrational and unequal evaluation the DEA actually delivered.

A.    **The Agency Irrationally Identified Two CEC Award Discriminators Under Factor 1.**

64.    First, the evaluators identified two supposed benefits in CEC's quote that purportedly exceed the requirements and, according to the Agency during the GAO proceedings, even functioned as award discriminators in favor of CEC: (1) exceeding the requirement of RFQ Section 6.0(h) of "applicant inquiries of 200 per month" through a "proven surge capability of 28,000 applicant inquiries per month;" and (2) offering a capability for customized dashboards to track project progress during the transition phases. (GAO AR Tab 2 (Part 1), Contracting Officer Statement of Fact ("COSF") at PDF 16; GAO AR Tab 10 (Part 3), Award Decision Memo at PDF 33.) But these alleged discriminators do not represent advantages over FYI and, in the case of the former of the two purported benefits, do not even ███████████████████████████

65.    Regarding the first benefit—the supposed ability to exceed the RFQ criteria for "applicant inquiries"—the DEA's assessment misstates both the RFQ criteria and the actual content of CEC's quote. Starting with the RFQ criteria, the RFQ does not impose a performance requirement of "applicant inquiries of 200 per month," as the DEA evaluators suggest. The RFQ, instead, requires the selected vendor to "**[r]espond**" to 200 applicant inquiries per month. (GAO AR Tab 4 (Part 2), RFQ. Am. 1 at PDF 163.)

66.    CEC's statement did not propose to exceed this actual metric and, indeed, ██████ ████████████████████████████ The relevant language in the CEC quote is a passing reference that appears ████████████ and states as follows:

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████

23

████████████████████████████████████████
████████████████████████████████████████

(CEC Tech. Quote at 21.)

67.    Neither the foregoing passage ███████████████████ states that CEC

has <u>responded</u> to 28,000 inquiries per month.  All that CEC states is that the ████████████

████████████████████████████ which is not the same as *responding* to a corresponding

number of inquiries.  (*Compare id. with* GAO AR Tab 4 (Part 2), RFQ. Am. 1 at PDF 163.)  CEC

never says it has responded to a particular number of applicant inquiries and does not otherwise

████████████████████████████████ much less ██████████

████ it.  Nor has CEC provided any information beyond the cited language upon which the

Agency could have rationally inferred that CEC has also ████████████████████

████████████████████████.[5]

68.    In fact, CEC did not even propose ████████████████████████

████████████  In this connection, it bears emphasis that CEC attributes ████████████████

████████████████████ (CEC Tech. Vol. at 21.) ████████████████

████████████████████████████████████████

████████████████████████.[6]  CEC does not mention ████████████████

████████ in its Factor 1 quote outside the passing reference to the ████████████████

████████████ never claims that ████████████████████████████████

████████████████.[7]  Stated otherwise, nothing in CEC's quote supports the Agency's apparent

---

[5] The DEA evaluators in any event did not purport to make any inferences regarding CEC's ability
to respond to applicant inquiries based on the number of applications it has reviewed.  The DEA
instead apparently conflated the stated metric of responding to applicant inquiries with the unstated
metric of reviewing applicant inquiries and treated them as the same.  (GAO AR Tab 10 (Part 3),
Award Decision Memo at PDF 33.)

[6] ████████████████████████████████████

[7] The absence of any language in the CEC quote suggesting ████████████████████
████████████ is notable given CEC's specific mention that ████████████████████████

24

████████████████████████████████████████████████████

finding that CEC will ███████████████████████████████████████████

███

69.     In short, the "benefit" that the Agency identifies as a CEC award discriminator is

illusory. CEC ███████████████████████ the RFQ metric, certainly not the RFQ metric of

responding to at least 200 applicant inquiries per month, nor did CEC ███████████████████

████████████████████████████████████████████████ The Agency's misapplication of

the RFQ requirements and misinterpretation of CEC's quote relative to those requirements leave

the Court without a rational basis on which to uphold the Agency's corresponding finding that CEC

exceeded the criteria. *2M Research Servs., LLC v. United States*, 139 Fed. Cl. 471, 480 (2018)

(finding that Court has "no choice" but to find the agency's assessment of the awardee arbitrary

and capricious where the agency's evaluation findings contravene the solicitation); *Hunt Bldg. Co.,*

*Ltd. v. United States*, 61 Fed. Cl. 243, 273 (Fed. Cl. 2004) ("agency's failure to follow its own

selection process embodied in the Solicitation is also a prejudicial violation of a procurement

procedure established for the benefit of offerors"). That the Agency may have ultimately accorded

this irrational finding outcome-determinative weight in the best value determination establishes

that the Agency's error prejudiced FYI, which, but for the Agency's serious error would have

received the award.

70.     The second award discriminator the Agency attributed to CEC under Factor 1—

that CEC's proposed to use "customized dashboards" exceeded the requirement—is equally

irrational. The only reference in the underlying evaluation materials to customized dashboards is

─────────────────────────

████████████████████████████████████████████████████████████████
████████████████████

██████████████████████████████████████████████

the evaluators' reference to ███████████████████████████ (GAO

AR Tab 5 (Part 3), CEC Tech. Eval, at PDF 3.)  The relevant portion of CEC's quote states: ███

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████  (CEC Tech. Quote at 2.)  The Award Decision Memorandum, for its part, more

directly identifies that the benefit which the evaluators found to exceed the requirement is CEC's

"offered capability for customized dashboards to track project progress during the transition phases

. . ."  (GAO AR Tab 10 (Part 3), Award Decision Memo. at PDF 33.)

71.     The Agency's finding that CEC's proposed use of dashboards in transition "exceeds

requirements" and functions as a CEC award discriminator is problematic for several reasons.  (*Id.*;

*see also* GAO AR Tab 2 (Part 1), COSF at PDF 16.)

72.     For one, as described more fully below under Counts II and IV, the Agency's

apparent finding that CEC's proposed use of dashboards renders its quote superior to FYI's cannot

be rationally reconciled with the DEA's separate finding that FYI, ███████████████████

████████████████████████████████████  (noting as to

FYI that █████████████████████████████

73.     The RFQ requires that the Agency conduct its technical evaluation to "determine

the relative merits of the Quoter's quote."  (GAO AR Tab 4 (Part 2), RFQ Am. 1 at PDF 182.)

The Agency's assessment, however, improperly inverts the RFQ requirement.  That CEC even

████████████████  irrespective of what tools it proposes to make the process more efficient or

less risky, is █████████████████████  because, as the SSA observed,  FYI ███████

████████████████.  That is, even if CEC's use of dashboards to monitor transition is of benefit,

the Agency's finding that this benefit exceeds requirements ███████████████████████

████████████████████████████████████████

███████████████████████████████████████████ This illogical

outcome further emphasizes the irrationality of the Agency's finding that CEC's use of dashboards

in transition "exceeded requirements" relative to other quoters.

74.    Further, the Agency's treatment of dashboards as a unique CEC attribute overlooks

that FYI ████████████████████████████ In a quote section entitled

████████████████████████████████████████

████████████████████████████ (FYI Tech. Quote at 26.) █████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███  ███   Further, FYI's ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████ And, speaking to its ability

to ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

75.    FYI's ███████████████ demonstrates that CEC's quote reference to

dashboards by no means constituted ████████████. Even if the Agency rationally found CEC's

use of dashboards during transition as a benefit, the Agency's failure to ████████████

████████████████████████ shows that the Agency did not fairly and

equally assess the quoters upon their relative merit. ██████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

76.     To reiterate the basic bottom line: neither of the two discriminators the Agency identified in favor of CEC provide a rational basis to find CEC technically superior to FYI. The prejudice to FYI stemming from these errant findings is clear because, but for these findings, the Agency would not have found CEC superior under Factor 1—the most important evaluation factor. Even without correcting any additional flaws in the DEA's evaluation, the removal of either of these two errant findings from the evaluation record likely would have led the DEA to select FYI's comparatively rated and lower price quote.

**B.     The Agency Contravened The RFQ And Treated FYI And CEC Unequally By Refusing To Recognize FYI Quote Features Which Exceeded Stated Metrics.**

77.     The evaluation record additionally reflects that the Agency failed to note numerous discriminators in FYI's quote under Factor 1 that exceeded requirements. Indeed, in the course of the GAO proceedings, the DEA even admitted that it knowingly withheld evaluation credit from aspects of FYI's approach once the DEA determined that FYI's Factor 1 submission merited a High Confidence rating. (Supplemental Contracting Officer Statement of Facts ("Supp. COSF") at 10 ("FYI received a high confidence rating for this factor. The TEP had no requirement to make an additional exceeds expectations notation").) This apparent evaluation standard contravenes the RFQ, under which the Agency committed to focus its evaluation on finding the best value quoter and to assess quoters upon their full relative merit. (GAO AR Tab 4 (Part 2), RFQ Am. 1 at PDF

████████████████████████████████████████████████

183.) By failing to evaluate FYI as the RFQ requires, the evaluators improperly obscured from the SSA's view key FYI advantages under Factor 1.

78.    For instance, whereas the evaluators found CEC to "exceed requirements" merely for ███████████████████████████████████████████████ FYI demonstrated the ability to exceed the ████████████████████████████████ ████. In this regard, FYI's quote states in relevant part:



(FYI Tech. quote at 12 (emphasis added).)

79.    Thus, if the ability to ████████████████████████████████████ ██████████████████████████ FYI, not CEC, has provided the benefit by demonstrating an ability to ████████████████████████████████████ ██████    (*Id.*)

80.    The Agency's apparent reluctance to credit FYI for exceeding the stated requirements violates the RFQ requirement to assess quoters upon their relative merit. It also shows that the Agency did not treat the quoters evenhandedly. Whereas the DEA did not credit FYI for exceeding requirements once it hit the high confidence rating, the Agency did not similarly refrain from making "additional exceeds expectations notation[s]" for CEC, even going as far to positively assess CEC for purportedly exceeding unstated metrics. (Supp. COSF at 10.) The DEA's failure to subject FYI and CEC quotes to the same objective criteria constitutes unequal treatment. *Office Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020) (explaining

that a protester may prevail on a disparate treatment argument by showing that the agency inconsistently applied objective solicitation requirements between it and other offerors).

81.     Upon a rational and equal evaluation premised on the quoters' actual relative merits vis-à-vis the stated criteria, the Agency would have found the ability to exceed the █████████ ███████████████ as an FYI award discriminator.  *Tesla Labs., Inc. v. United States*, 172 Fed. Cl. 505, 529 (2024) (protester prejudiced by agency application of inconsistent evaluation standard because the protester may have received a higher assessment but for the error).

82.     The Agency also overlooked additional ways in which FYI exceeded the stated metrics.  For instance, the RFQ identifies ████████████████████████████ ████████████████████ (GAO AR Tab 4 (Part 2) at PDF 137.)   In turn, ███████████ ██████████████████████████████████████████████████████████ ███████████████████████████████████████ Speaking to its ability to exceed this metric, FYI's quote states:

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████
███████████████████

83.     Although FYI demonstrated the ability to substantially exceed the RFQ metrics to the DEA's benefit, the DEA evaluators once more overlooked this materially beneficial feature of FYI's approach.  By implication, the Agency evaluators presented to the source selection authority an incomplete picture of the relative merits of FYI's quote, in further contravention of the RFQ.  But for the DEA's (unequal) application of an errant evaluation standard to FYI's Technical quote,

30

███████████████████████████████████████████████
███████████████████████████████████████████████

the evaluators would have recognized additional discriminators in FYI's favor, in turn substantially increasing FYI's chance of award.

### C.    The Agency Treated The Vendors Unequally By Positively Assessing CEC Only Even Where FYI Proposed A Substantially Similar Feature.

84.    The Agency provided an even more skewed assessment of the CEC and FYI quotes' relative merits by positively assessing attributes of CEC's approach only despite that FYI provided substantially the same or even superior features. As a result of these further instances of disparate treatment, the evaluators errantly created the misimpression that CEC submitted a stronger quote, to FYI's substantial prejudice.

85.    To illustrate, for CEC, the evaluators recognized CEC's ███████████████

████████████████████████████████████████████████████

███████████████████ (GAO AR Tab 5 (Part 3), CEC Tech. Eval. at PDF 3.) Although CEC

█████████████ CEC also noted █████████████████████████ (CEC

Prop. at 4 ████████████████████████████████████████████

█████████.) FYI, for its part, did not just ████████████████████████

FYI also demonstrated ███████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████ FYI further explained that ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

(FYI Tech. Quote at 4.) Yet the Agency credited CEC's ████████████████ without so

████████████████████████████████████████████████████

much as recognizing, let alone positively assessing, FYI's ███████████████████████

███████████ If ████████████████████████████ "raises the expectation of success,"

██████████████████████████████████████████ surely should instill

substantially greater confidence in the vendor's ability to perform successfully. The DEA's failure

to recognize in FYI's quote ████████████████████ as those it recognized in

CEC's quote constitutes unequal treatment. *Thallle Construc. Co., Inc. v. United States*, 159 Fed.

Cl. 698, 716 (2022) (failure to credit nearly identical materials as those the agency praises in

another proposal is arbitrary and capricious).

86.    As a further notable example, the evaluators found that ████████████████

████████████████████████████████████████████ (GAO AR Tab

5 (Part 3), CEC Tech. Eval. at PDF 3.)  The Agency notably made no mention of FYI's ████

█████████ notwithstanding that FYI's ██████████████████████████████████

████████

87.    For instance, FYI proposed ████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██ To illustrate, for its ████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████

(*Id.* at B-5.)

88.    Using the same approach for ███████████████████ the FYI quote shows

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

89.    Considering the RFQ requirement to evaluate quoters on their ability to provide

████████████████████████████████ the Agency's failure to

even recognize that FYI also provided ████████████████ shows that the Agency did not

rationally evaluate FYI in accordance with the RFQ.

90.    Beyond misevaluating FYI, the Agency treated the quoters unequally by crediting

CEC only for purportedly ███████████████████ even though FYI ██████████

███████████████████████

91.    The Court, accordingly, should (a) declare the Agency's failure to evaluate FYI and

CEC equally and consistent with the Solicitation and the law arbitrary, capricious, an abuse of

████████████████████████████████████████

discretion, or otherwise contrary to law; (b) declare the Agency should conduct a new Factor 1 evaluation and make a revised, proper source selection decision upon the quoters' relative merits; and (c) preliminarily and permanently enjoin the Agency from proceeding with contract performance absent a corrected evaluation and new award decision.

## COUNT II
### The Agency Misevaluated And Unequally Evaluated CEC and FYI Under Factor 2
### (Transition In/Transition Out)

92.     FYI incorporates paragraphs 1 through 91 of the Complaint by reference.

93.     Relative to Factor 2, Transition In/Transition Out, the RFQ commits the DEA to "evaluate the Quoter's ability to implement a transition plan <u>without impacting the operations</u> of the program during the phase-in and phase-out periods during the contract performance." (GAO AR Tab 4 (Part 2), RFQ Am. 1 at PDF 184.)  With respect to transition-in, the RFQ states that "[t]he Government will evaluate the Quoter's transitions in accordance with its timeline to complete all phase-in activities within thirty (30) days of the effective date of the award." (*Id.*) Specifically, the RFQ directs that the evaluation will consider the quoter's plan for:

- Management of Phase-In Activities

- Initial Staffing Levels and Timeline to achieve Full Staffing Level

- Management of Knowledge Transfer Activities

- Ensuring No Disruption of Work and Maintaining Continuity of Operations

- Transfer of Government Furnished Property, Material, Equipment and Data, if applicable.

- Monitoring and Reporting of Transition Progress.

(*Id.*)

94.     Further, in all best value procurement such as this, the evaluation's dominant purpose is to differentiate the quotes by assessing their relative merit in order to identify the most

advantageous offeror. *Arctic Slope Tech. Servs., Inc.*, B-411776, Oct. 20, 2015, 2015 CPD ¶ 6 (in a best value procurement, "proposals should be further differentiated to distinguish their relative quality under each stated evaluation factor by considering the degree to which technically acceptable proposals exceed the stated minimum requirements or will better satisfy the agency's needs").

95.    Consistent with the general principles underlying best value procurements, the RFQ commits the Agency to conduct its technical evaluation to "determine the <u>relative</u> merits of the Quoter's quote." (GAO AR Tab 4 (Part 2), RFQ Am. 1 at PDF 182.) The resulting technical rating, in turn, must "reflect[] the <u>degree</u> to which the proposed approach meets or does not meet the minimum performance or capability requirements through the assessments of strengths, weaknesses, deficiencies, and risks of a quote." (*Id.* at PDF 183.) As to Factor 2, the foregoing evaluation requirements mean that the DEA had to *qualitatively* assess each quoter's proposed transition-in/transition-out plan and determine the transition quote's merit relative to other quoters.

96.    The evaluation record demonstrates that the DEA arbitrarily departed from these requirements by failing to distinguish quotes on their relative merit and treating CEC and FYI unequally. As a result of these errors, the Agency assigned FYI and CEC the same high confidence rating and treated them as equivalent under Factor 2 despite that FYI, ███████████████ ██████████████████████████████████████.[8]  No rational evaluation could so conclude.

---

[8] As more fully described under Count IV, the source selection official's best value decision even impliedly treated CEC's transition approach as superior because CEC proposed to use dashboards in transition. (GAO AR Tab 10 (Part 3), Award Decision Memo at PDF 33.)

97.     First, the Agency contravened the RFQ and the obligations of agencies conducting best value procurements more broadly by failing to distinguish CEC's and FYI's transition approaches or assess them on their "relative merits." (GAO AR Tab 4 (part 2), RFQ Am. 1 at 182.) The DEA, instead, admitted in the course of the GAO proceedings that it assigned any quoter who met the requirements a High Confidence: "All quoters that positively addressed the requirements of the RFQ, received a high confidence rating." (Supp. COSF at 7.)

98.     Far from a technicality, the DEA's violation of the RFQ requirement for a relative assessment of quoters overlooked key transition discriminators in favor of FYI and, by corollary, obscured FYI's clear superiority under Factor 2.

99.     Starting with the CEC evaluation, the Agency repeatedly credited CEC and ultimately assessed it a high confidence for merely proposing to meet the RFQ requirements. (GAO AR Tab 5 (Part 3), CEC Tech. Eval. at PDF 4 (noting as to CEC: "RFQ requirements met and all components addressed . . .") To illustrate, the DEA credited CEC for ██████████████ ██████████████████████ which merely meets the RFQ requirement ███████████████ (*Compare id*. with (GAO AR Tab 4 (Part 2), RFQ Am 1 at PDF 184.) The Agency likewise credited as an attribute that "raises expectations of success" CEC's ██████████████████ ████████████████████████████████████████████████ ██████████████████████ (GAO AR Tab 5 (Part 3), CEC Tech. Eval. at PDF 4.) This, again, is merely an RFQ requirement which all quoters had to meet. (GAO AR Tab 4 (Part 2), RFQ Am. 1 at PDF ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████

████████████████████████████████████████████████████

100.    Whereas CEC at best met the RFQ requirements ███████████████, FYI

substantially exceeded these requirements, including by ████████████████████

█████████████ (FYI Tech. Quote at 31-32 ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

█████████████.)  In proposing to do, FYI offered to ███████████████████

██████████████████████████ In contrast to CEC, FYI's quote shows

it has ██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████ (*Id.* at 29.)  Unlike ██████████████

████████████████████ FYI emphasized ███████████

█████████████████████████████████ in turn ██████

████████████████████████████████████████████

█████████████ ██ (*Id.* at 30.)  Moreover, while CEC proposed █████████

██████ (a feature that, as described below, the Agency irrationally recognized as an attribute

that "raises the expectation of success" of CEC only), FYI ██████████████

██████████ and, unlike CEC, ███████████████████████████

(*Id.* at 11 ████████████████████████████████████

████████████; *see also* CEC Tech. Quote at 25 █████████████

████████████████████████

101.    Given that the RFQ commits the Agency to evaluate quoters on their ability to

complete transition tasks within 30 days without disruption to services, an approach, ████████

████████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████[9] CEC did not provide (and could not have provided) even remotely similar transition benefits relative to the stated criteria. (CEC Tech. Quote at 27 ████████████████████████████████████████████████

███████████████████████████████████

102.    The Agency, however, failed to properly credit these numerous ways in which FYI surpassed the stated transition criteria (especially relative to CEC) to the Government's benefit. Consistent with the Agency's acknowledgment that it assigned any quoter who met the requirement a High Confidence, the Agency's entire evaluation of FYI's transition-in plan under Factor 2 reduces to two short sentences providing little more than █████████████████████████

█████████████████████████



(GAO AR Tab 6 (Part 3), FYI Tech. Eval. at PDF 10.)

103.    The only language within the truncated evaluation that even remotely recognizes FYI's ███████████████ is the evaluators' citation to █████████████████████████ ████████████████████████████████████████████████ However, the DEA evaluators did not make any finding based on this cited quote language and did not otherwise recognize ████████████████████████████████

██████████████████████████

---

[9] Although the SSA's finding that FYI ████████████████████ appears to recognize that FYI exceeds the RFQ transition requirements to the DEA's benefit, the SSA irrationally did not consider this clear award discriminator in favor of FYI in the tradeoff analysis.

████████████████████████████████████████████

104.    By reflexively assigning all quoters which met the Factor 2 requirements a High Confidence rating and flouting the requirement to assess the quoters on their "relative merits," the Agency overlooked clear FYI transition advantages relative to CEC under the stated criteria. Properly considered, these FYI discriminators would have led the Agency to rightfully recognize FYI as significantly superior under Factor 2 (Transition-In/Transition-Out) and award it the BPA.

105.    The DEA's failure to reach evaluation conclusions consistent with the full picture presented by the CEC and FYI quotes contravenes the RFQ and lacks a rational basis under fundamental principles of administrative law. *Lab. Corp. of Am. Holdings*, 116 Fed. Cl. at 652 (technical evaluation arbitrary and capricious where but for agency's departure from solicitation requirements, the agency would have determined the protester superior); *Blue Mgm't Grp., LLC v. United States*, 150 Fed. Cl. 588, 614 (2020) (agency's significant departure from factors and procedures outlined in solicitation renders its evaluation arbitrary and capricious); *Cadell Construc. Co. v. United States*, 125 Fed. Cl. 264, 275 (2016) (reiterating the established principle that, to withstand review under the APA, agencies must examine the relevant data and articulate a satisfactory explanation for their actions, including a rational connection between the facts found and the choice made) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43).

106.    Second, the DEA's record shows that the DEA contravened even its irrational evaluation standard (namely, assessing any quoter which meets the requirements a high confidence rating without distinguishing the quoters) by crediting specific aspects of CEC's transition while ignoring virtually identical (or even more meritorious) aspects of FYI's approach. That is, the DEA subjected the quoters to dueling evaluation standards that reflect unequal treatment and which further masked FYI's relative merits. *See, e.g., Kropp Holdings, Inc*, 176 Fed. Cl. at 551

(finding unequal treatment where agency assessed one offeror a weakness but lauded another offeror's similar proposal feature). *See CW Gov't Travel, Inc.*, 110 Fed. at 490 (recognizing that agencies must "evaluat[e] proposals evenhandedly against common requirements"); *see also Banknote Corp. of Am., Inc.*, 56 Fed. Cl. at 383 ("it is beyond peradventure that a contracting agency must treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria")

107.    For example, the evaluators praised CEC for stating that  and noted it as an attribute that increases the likelihood of success. (GAO AR Tab 5 (Part 3), CEC Tech. Eval. at PDF 4; *see also* CEC Tech. Quote at 27.) But FYI's quote almost identically states that

(FYI Tech. Quote at 30.) And whereas CEC merely                                                              FYI

(*Id.* at 31.) In fact, FYI (unlike CEC) even

which should have provided an even greater measure of confidence

(*Id.* at 5.) And yet, despite crediting CEC's

, the DEA evaluators inexplicably disregarded FYI's

(*Compare* (GAO AR Tab 5 (Part 3), CEC Tech. Eval. at PDF 4 *with* GAO AR Tab 6 (Part 3), FYI Tech. Eval. at PDF 10.) The DEA's failure to at minimum similarly credit nearly identical aspects of the FYI and CEC quotes—

—constitutes disparate treatment. *Office Deisgn Grp.*, 951 F.3 at 1372-73

(protester may prevail on unequal treatment claim where agency treated substantially indistinguishable or nearly identical proposal references differently).

108.    As another example, the evaluators credited CEC only because █████████ █████████████████████████████████ (GAO AR Tab 5 (Part 3), CEC Tech. Eval. at PDF 4.)  Conversely, FYI did not receive similar credit from the Agency although it also ███████████████████████████████████████████████████████████████████ ███████████



(FYI Tech. Quote at  29.)  Thus, not only has FYI proposed █████████████████████ but it has also ███████████████████████████████████████████████████ ██████████████████████████████████████████ Nothing in the evaluation record explains the Agency's inconsistent treatment of FYI's and CEC's similar quotes to ████████ ████████████████████████████████████████████████████.

109.    The Agency continued in its unfair and unequal treatment of the quoters by crediting CEC, but not FYI, for ████████████████████████████████████████ ████████████████████ (GAO AR Tab 5 (Part 3), CEC Tech. Eval. at PDF 4.)  But as explained, FYI ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████ Indeed, conversely to CEC, FYI also ████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████

110.     Overall, the Agency's application of varying evaluation standards to the quoters is apparent on the face of the evaluation record that was before GAO.  For FYI, the Agency provided only a high-level, two-sentence assessment of FYI's transition-in: ████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

(GAO AR Tab 6 (Part 3), FYI Tech. Eval. at PDF 10.)  For CEC, by contrast, the DEA provided a detailed assessment of the supposed benefits of CEC's transition, even where the so-called benefit was a minimum RFQ requirement or where FYI proposed essentially the same or even greater benefits (for which FYI did not receive recognition).  (GAO AR Tab 5 (Part 3), CEC Tech. Eval. at PDF 4.)

111.     This Court repeatedly has recognized that an agency's "failure to follow the terms of its own Solicitation and selection of an offeror based upon different requirements those imposed upon the only other offeror are quintessential examples of conduct which lacks a rational basis." *2M Research Servs., LLC*, 139 Fed. Cl. at 480 (quoting *CliniComp Inti'l v. United States*, 117 Fed. Cl. 722, 741 (2014)).  Equally established is the principle that "a contracting agency must treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria." *CW Gov't Travel, Inc.*, 110 Fed. Cl. at 490 (2013) (citation omitted).

112.     Here, the Agency failed in its basic obligation to treat the quoters evenhandedly by subjecting CEC to a far more preferential evaluation standard, leading the Agency to overlook benefits in FYI's approach even beyond those that its unreasonable evaluation ignored. Consequently, the DEA irrationally assessed FYI and CEC as equivalent under Factor 2

████████████████████████████████████████████████

notwithstanding FYI's clear advantages under the stated criteria—that is, ██████████████████████ ████████████████████████████████████████████████ Upon a rational and equal Factor 2 evaluation in line with the RFQ, the Agency would have recognized numerous additional positive attributes in FYI's approach or far fewer in CEC's, yielding in either case the conclusion that FYI offers a superior transition plan.

113.    The Court, therefore, should (a) declare the Agency's failure to evaluate FYI and CEC equally and consistent with the Solicitation and the law arbitrary, capricious, an abuse of discretion, or otherwise contrary to law; (b) declare the Agency should conduct a new evaluation and make a revised, proper source selection decision upon the quoters' relative merits; and (c) preliminarily and permanently enjoin the Agency from proceeding with contract performance absent a corrected evaluation and new award decision.

**COUNT III**
**The Agency Misevaluated CEC And FYI Under Factor 3 (Past Performance)**

114.    FYI incorporates paragraphs 1 through 113 of the Complaint by reference.

115.    The DEA engaged in an unreasonable and inconsistent evaluation of FYI and CEC under Factor 3 – Past Performance. On the one hand, the Agency provided an inflated assessment CEC's less relevant and lower-quality performance. At the same time, the Agency minimized FYI's unique strengths, including that as ████████████████████████████████ ██████████████████████████████ As a result, the DEA arbitrarily assigned both CEC and FYI an Acceptable rating and errantly viewed them as equivalent under Factor 3.[10]

---

[10] Given that the Agency (errantly) purported to find CEC the best value quoter based on two alleged discriminators in its Technical quote (Factor 1), it stands to reason that the Agency viewed CEC and FYI as equivalent under Factor 3 (Past Performance). (GAO AR Tab 10 (Part 3), Award Decision Memo. at PDF 33; 44.)

██████████████████████████████████████████████████

116.    Although agencies have discretion in determining whether and to what extent an offeror's past performance instills confidence that the offeror will successfully perform the solicited tasks, such discretion is not unfettered. *DZSP 21, LLC v. United States*, 139 Fed. Cl. 110, 118 n. 9 (2018) (recognizing that despite the deference to the agency's past performance determinations, "when those determinations are contradicted by the record, no amount of deference can save them from being overturned as arbitrary and capricious and an abuse of discretion"). An agency's past performance evaluation must nonetheless be reasonable, consistent with the stated evaluation criteria, and compliant with the applicable law. *Q Integrated Cos., LLC v. United States*, 126 Fed. Cl. 124, 142 (2016).

117.    Regarding the need to comply with applicable law, an agency's past performance evaluation, like its actions in all other contexts, must be supported by a rational basis. An agency must examine the relevant data and articulate a satisfactory explanation for its actions to withstand arbitrary and capricious review under the APA. *Motor Vehicle Mfrs. Ass'n of U.S., Inc.* 463 U.S. at 43.

118.    The DEA's evaluation fails the foregoing requirements. Although FYI rightfully received an overall rating of Acceptable (the highest rating available under Factor 3), the Agency ████████████████████████████████████████████████████████████ ████████—that individually and collectively  diminished FYI's relative standing.

119.    Most notably, the evaluators observed that ███████████████████████ ████████████████████████████████████████ (GAO AR Tab 6 (Part 3), FYI Tech. Eval. at PDF 11.)    This statement lacks reason: ████████ ████████████████████████████████████████████████████████ ████████████████████████████

███████████████████████████████████████

120. By way of further minimizing ███████████████████████████████ ███████████████████████, the evaluators ████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████ (*Id.* at PDF 12.) ████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████ In fact, as recently as ████████████████ ████████████████████████ the Agency issued FYI a CPAR that █████████████ ████████████████████████████ ■ (*Id.* at 8.) ████████████████████████ ███████████████████████████████████ the ████████ CPAR ████████████ ████████

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

████████████████████

121. To reach either of the foregoing ████████████████ regarding ████████████ ████████████████████████████████ the DEA necessarily had to ignore its own CPARs for the incumbent effort ██████████████████████████████████████████████████████ ████████████

---

11 ███████████████████████████████████████████████████████████
███████████████████████████████████████████████████
█████████████████████

███████████████████████████████████████████████

122.    And, indeed, as the DEA admitted in the course of the GAO proceeding, that is precisely what the DEA did.  More specifically, the technical evaluations for both CEC and FYI contain the following statement regarding the DEA's past performance methodology:  "CPARS (all CPARS) were pulled by the DEA contracting team and in some cases those provided by quoters were not readily available in CPARS so three were pulled for each (if those listed in a given quoter's quote were available they were pulled and if they were not three other CPARS were pulled.)  This in conjunction with what was included in Quoter's response."  (GAO AR Tab 5 (Part 3), CEC Tech. Eval. at  PDF 6; GAO AR Tab 5 (Part 3), FYI Tech. Eval. at PDF 12.)    Speaking on this issue in more detail in responding to FYI's protest before GAO, the contracting officer █████

███████████████████████████████████████████████████████████████████████████

████████████ explained:

> It is further noted when pulling CPARs for FYI, their existing contract with DEA was not available to pull from CPARs.  Therefore, two of the other performance they listed were pulled along with a random CPAR. ████████████████████████ ████████████████████████████████

(Supp. COSF at 11.)

123.    The DEA's acknowledged failure to consider the CPAR it issued to FYI on the incumbent effort highlights the arbitrary and capricious nature of the DEA's evaluation.  Having elected to evaluate quoters on CPARS information, it is not a valid excuse that the incumbent CPARs were "not available to pull from CPARS" which necessarily stems from DEA's violation of its duty under the FAR to timely submit the report into CPARS.  FAR 42.1503(f) (requiring agencies to "prepare and submit all past performance evaluations electronically in CPARS," and providing that once the agency does so, the report "become[s] available for source selection

████████████████████████████████████████████████████

officials not later than 14 days after the date on which the contractor is notified of the evaluation's availability for comment").

124.    As this Court has observed, although agencies typically have discretion to consider certain past performance information, this discretion at times transforms into an obligation: under the "too close at hand doctrine, there is certain information about past performance that if the agency is aware of, it cannot ignore." *Integrated Fin. & Acct. Sols., LLC v. United States*, 161 Fed. Cl. 475, 490 (2022).  That is especially the case under the facts of this case, that is, where an agency fails to consider information available to evaluating officials about an incumbent's performance for similar or identical services covered by the solicitation with the same procuring agency.  *See, e.g.*, *Vertex Aerospace, LLC*, B-421835, B-421835.2, Nov. 1, 2023, 2023 CPD ¶ 249 (explaining that the "too close at hand" doctrine "generally concern[s] contracts for the same services with the same procuring activity, or at least information personally known to the evaluators); *see also DZP 21, LLC v. United States*, 139 Fed. Cl. 110, 118 (2018) (agency past performance conclusions flawed where agency failed to consider protester's "quite pertinent" performance on bridge contracts performing the same services as under the new contract).

125.    This Court and GAO have sustained protests challenging an agency's failure to consider material past performance information available to it regarding the incumbent or predecessor effort, ███████████████████████████████████

███████████████████████████    For example, this Court concluded that an agency acted arbitrarily and capriciously where it failed to consider the plaintiff's performance on the predecessor procurement, finding that such information was "simply too relevant and close at hand to ignore." *Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560 (2000).  Likewise, the GAO repeatedly has sustained protests where the agency failed to consider material information known

to it regarding the protester, including where the agency failed to consider a CPAR it issued to the protester under the incumbent effort. *Int'l Bus. Sys., Inc.*, Mar. 3, 1997, 97-1 CPD ¶ 114 (sustaining protest where agency failed to consider protester's "exemplary" past performance on a related contract); *CSR, Inc.*, B-413973, B-413973.2, Jan. 13, 2017, 2017 CPD ¶ 64 (sustaining protest where agency failed to consider all available, relevant CPARs when evaluating the protester).

████████████████████████████████████ (sustaining protest where, ██████

████████████████████████████████████████

███████████████████████████ the agency failed to consider the CPAR, █████

███████████████████████████████████████

████████████████████████████

126.    The too close at hand rule applies with particular force to this procurement, where the DEA evaluators plainly had the ████████ CPAR within their possession or at the minimum knew of its contents—a fact that is all the more apparent given that ████████████████████

████████████████████████████████████████ (FYI

Incumbent CPARs at 9, Ex. C.) The materiality of FYI's incumbent CPAR to the past performance evaluation is also beyond question, as there is perhaps no better indicator of future performance—precisely what the RFQ committed the Agency to assess under Factor 3—than the offeror's performance on the predecessor effort.  (GAO AR Tab 4 (Part 2), RFQ Am. 1 at 185 (requiring the DEA to assess its level of confidence in the quoter's performance based on past performance information it receives or obtains for the quoter).)  Accordingly, the Agency had to consider FYI's recent incumbent CPAR, even if the report was "not available to pull from CPARS."  As a corollary of the Agency's failure to do so, ████████████████████████████████████

████████████████

██████████████████████████████████████████████

127.    The Agency's arbitrary findings crept into its assessment of FYI and prevented the Agency from properly recognizing the full merit of FYI's successful incumbent performance, to FYI's significant prejudice.  Had the DEA considered FYI's incumbent CPARs, it ███████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ((GAO AR Tab 6 (Part 3), FYI Tech. Eval. at PDF 11)  Further, but for the Agency's refusal to consider its own recent, official assessment of FYI's performance ████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████ With ████████████████████████ ██████████████████ the Agency like would have recognized FYI's superiority over CEC under Factor 3.  In this connection, it bears emphasis that the DEA viewed CEC and FYI as equivalent under Factor 3, and as such even less dramatic shifts in the evaluation could have materially impacted the outcome and tilted the evaluation and best value determination in FYI's favor.

128.    Compounding the prejudicial impact of its irrational findings regarding FYI, the Agency elevated CEC's objectively inferior past performance record in ways that reflect an arbitrary departure from the RFQ requirement to evaluate the quoters on their *relative* merit. (GAO AR Tab 4 (Part 2), RFQ Am. 1 at PDF 182.)

129.    For example, the evaluators emphasized CEC's ████████████████████████ ████████████████████████████████████ as a factor which "raises expectations of success."  (GAO AR Tab 5 (Part 3), CEC Tech. Eval. at PDF 5.)   The record produced at GAO reflects that this is ████████████████████ that CEC received ████████████████ ████████████████ ; CEC received ████████████████████████████████████ ████████████████████████████████ (DEA's ████████████████  For

49

██████████████████████████████████████████████

FYI and CEC at 9, 22, 36.)  Conversely, the DEA's record shows that it is FYI that has exhibited ███████████████████████████ having received ███████████████████████

███████████████████████████████

130.    In line with the requirement to assess quoters on their relative merit, the DEA, at a minimum, should have recognized FYI's ████████████████████████ certainly relative to CEC.  The DEA however, did not, and instead only noted ███████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

131.    The Agency's overt failure to fully capture or recognize ███████████████ ██████ of FYI's ████████████ (certainly relative to CEC) contravenes the RFQ and further establishes that the Agency's assessment of FYI and CEC as equivalent under Factor 3 lacks a rational basis.  *AshBritt, Inc. v. United States*, 87 Fed. Cl. 344, 374 (2009) (granting judgment for unsuccessful bidder and noting that it "is a fundamental tenet of procurement law that proposals must be evaluated in accordance with the terms of the solicitation"); *KGJJ Eng'g Sols, LLC v. United States*, 161 Fed. Cl. 556, 569 (2022) (concluding that the agency did not properly evaluate past performance where, ████████████████████████████████████████

███████████████████████████ but the administrative record did not convey that the agency did so).  But for this error, the DEA would not have carried into the source selection determination the false impression of parity between FYI and CEC under Factor 3, and the Agency would have rightfully recognized FYI as having superior past performance.

132.    Accordingly, in light of the foregoing errors, the Court should (a) declare the Agency's failure under the Past Performance Factor to evaluate FYI and CEC consistent with the

50

███████████████████████████████████████

Solicitation and the law arbitrary, capricious, an abuse of discretion, or otherwise contrary to law; (b) declare the Agency should conduct a new evaluation and make a revised, proper source selection decision upon the quoters' relative merits; and (c) preliminarily and permanently enjoin the Agency from proceeding with contract performance absent a corrected evaluation and new award decision.

### COUNT IV
### The Agency Reached An Arbitrary And Capricious Best Value Determination Premised Upon On An Irrational Tradeoff

133.    FYI incorporates paragraphs 1 through 132 of the Complaint by reference.

134.    The DEA's evaluation documents and award decision memorandum evince several errors that render the best value determination and resulting award decision to CEC arbitrary and capricious.  First, the Agency contravened the FAR, the APA, and the RFQ by failing to document any logical explanation in its tradeoff analysis for the conclusion that CEC's higher-price quote warrants paying a price premium.  DEA's entire rationale for its tradeoff determination reduces to a single conclusory sentence that myopically focuses on CEC's supposed benefits and does not reflect any comparative assessment of the quoters (despite the RFQ's requirement to assess the quoters on their relative merit).  Equally problematic, the DEA's conclusory tradeoff disregards the Agency's own findings regarding FYI ███████████████████████████████████ ██████████████████████.  For this reason, the Agency has not articulated a logical connection between the facts founds and choices made, as is necessary to withstand arbitrary and capricious review.  Second, the DEA's best value determination is irrational because it derives from an underlying evaluation that contained numerous prejudicial errors.  With a rational best value determination, and certainly one based on a correct underlying record, the Agency would have found FYI's lower-price, technically superior quote to offer the best value.

A. **The Agency Performed An Arbitrary And Capricious Technical/Price Tradeoff.**

135.    The law applicable to best value procurements requires agencies to "compare the price and non-price factors among the offerors to determine the best value to the government." *Reli Grp., Inc. v. United States*, 174 Fed. Cl. 630, 640 (2025) (citation omitted). This requirement applies equally to FSS procurements, such as the one here, conducted pursuant to FAR Part 8 procedures. *CSR, Inc.*, B-413973, Jan. 13, 2017, 2017 CPD ¶ 64 (citing *Sobran, Inc.*, B-408420, B-408420.2, Sept. 13, 2013, 2013 CPD ¶ 121) ("In this regard, where an acquisition conducted pursuant to subpart 8.4 provides for award on a best-value tradeoff basis, it is the function of the source selection authority to perform a price/technical tradeoff to determine whether a quotation's technical superiority is worth its higher price").

136.    When a FAR part 8.4 procurements includes a statement of work, as is again the case here, the FAR requires that the agency document a rationale for any tradeoff made. FAR 8.405-2(f)(5). This offered tradeoff rationale must be meaningful rather than *pro forma*. And in particular, despite that FAR Part 8.4 permits more streamlined documentation than procurements conducted under FAR Part 15, "this streamlined documentation does not get the agency off the hook" when, it provides little documentation for its rationale. *DigiFlight. Inc. v. United States*, 165 Fed. Cl. 588, 607 (2023) (further stating that "FAR 8.4 is clear" that "the streamlined or 'minimum' documentation required by FAR subpart 8.4 does not mean that the agency can provide almost no rationale for the decisions made on the technical evaluation"). Rather, "a procuring agency must document and explain its basis for awarding a contract to a particular offeror with sufficient clarity even in FAR 8.4 procurements." *Tesla Labs., Inc.*, 172 Fed. Cl. at 536-37. This rationale must "be supported by a rational explanation of why the higher-rated quotation is

superior, and why that technical superiority warrants paying a price premium." *FreeAlliance.com, LLC et al.*, B-419201.3, B-419201.4, Jan. 19, 2021, 2021 CPD ¶ 56.

137.    Further, and independent of what the FAR requires, an agency must provide a rationale for its evaluation conclusions (to include its tradeoff assessment) with sufficient detail to pass muster under the APA standard of review. This means that an agency must "explain its action with sufficient clarity to permit effective judicial review," and the failure to do so requires vacating the agency action. *DigiFlight, Inc.*, 165 Fed. Cl. at 609 (citation omitted); *see also Golden IT, LLC v. United States*, 177 Fed. Cl. 118, 136 (2025) ("Where an agency's evaluations [are] too truncated to demonstrate rationality under the relevant APA standard[,] [they] cannot pass muster no matter what amount of streamlined documentation FAR 8.4 permits") (brackets in original). More specifically, "the agency must examine the relevant data and articulate a satisfactory explanation between the facts found and choices made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43.

138.    Here, the DEA's award document merely summarizes the evaluators' findings and then, without any attempt to comparatively assess the quoters, condenses the entire rationale for the determination that CEC's technical quote warrants a price premium into a single sentence:

> The High Confidence rating of C. Evan's [sic] Consulting, LLC's quote across all non-price factors along with their exceeding requirements offsets the higher price of their quote when compared to lower priced proposals which received equal or lower ratings across the non-price factors

(GAO AR Tab 10 (Part 3) at PDF 44-45.)

139.    DEA's conclusory one-sentence tradeoff analysis comports with neither the FAR, the RFQ, nor the APA. Notably missing from the documented tradeoff rationale (or the DEA's record more broadly) is any indication that the Agency compared the quoters to one another, or

distinguished them on their "relative merit," as the RFQ requires. (GAO AR Tab 4 (Part 2), RFQ Am. 1 at PDF 182.) It is instead apparent from the lone tradeoff sentence in the DEA's record that the Agency selected CEC because the technical evaluators found CEC to "exceed[] requirements," presumably by proposing to use dashboards in transition and purportedly demonstrating an ability to review applications in excess of the RFQ criteria. (GAO AR Tab 10 (Part 3) at PDF 44-45.)

140.    Even moving past the fact that the DEA erred in reaching both of these findings—which, as described *supra* under Count I provides a separate basis to find the DEA's evaluation and best value determination arbitrary and capricious—the DEA's offered rationale still fails to supply a reasoned basis for its tradeoff conclusion.

141.    Absent from the DEA's rationale is any justification, let alone a rational one, why it is that the two features of CEC's quote that "exceed[] requirements" warrant paying a price premium versus the FYI quote. Nothing in the DEA's evaluation record explains why CEC's use of dashboards in transition justifies a higher price ███████████████████████████ █████████████████████████████████████ or why CEC's supposed capability to surge applicant reviews up to 28,000 applications per month is of benefit to the DEA in this procurement. In fact, nothing in the offered justification or elsewhere in the DEA's procurement record suggests that the DEA even considered the two supposed attributes of CEC's quote that "exceed[] requirements" relative what other quoters proposed. All that the DEA offers in support of its tradeoff conclusion, in other words, is the conclusion itself—that is, that CEC's equivalent technical ratings and "exceed[] requirements" offset its relative price disadvantage. (GAO AR Tab 10 (Part 3) at PDF 44-45.)

142.    The DEA's conclusory tradeoff analysis and circular award rationale do not rise above the minimum that the FAR, the APA, or the RFQ require. Although it is true that FAR Part

8 does not require agencies to document every decision in rigorous detail, it also is true that agencies cannot provide next to no detail, as the DEA has done here. *Digiflight, Inc.*, 165 Fed. Cl. at 607 ("the streamlined or 'minimum' documentation required by FAR subpart 8.4 does not mean that the agency can provide almost no rationale for the decisions made on the technical evaluation"). Further, while an agency conducting a FAR Part 8 procurement need not document a comparative analysis of the offerors in rigorous detail (*Dist. Sols., Inc. v. United States*, 106 Fed. Cl. 1, 24 (2012)), it also cannot offer no comparative analysis at all—especially where, as here, the RFQ requires the DEA to assess offerors upon their *relative* technical merit.  . And, no matter what amount of streamlined documentation FAR 8.4 permits, the APA nonetheless mandates that agencies provide sufficient clarity in their decisions to permit effective judicial review. *Digiflight, Inc.*, 165 Fed. Cl. at 609.  The DEA has offered no such clarity in its tradeoff analysis; to the contrary, its rationale does not answer why CEC warrants a price premium but rather begs the question why CEC's perceived benefits are such that they justify paying more.

143.    To borrow from this Court when faced with a similarly truncated evaluation record, the DEA "forgot to show its work," and the DEA's failure to articulate anything more than a single conclusory statement in support of its tradeoff determination renders the tradeoff analysis and resulting best value determination arbitrary and capricious and contrary to law. *Id*. at 609; *Tesla Labs., Inc.*, 172 Fed. Cl. at 536-37 (observing that some of the agency's evaluations in the case were too truncated to demonstrate rationality under the applicable APA standard); *see also Castro & Co., LLC*. B-412398, Jan. 29, 2016, 2016 CPD ¶ 52 (sustaining protest of FAR Part 8 procurement where there was "no sign in the source selection decision that the contracting officer compared the evaluated merits of any questions or their price");  *Harmonia Holdings Grp., LLC*, B-417475.3, Sept. 23, 2019, 2019 CPD ¶ 333 (sustaining protest of FAR Part 8 procurement where

record contained no comparative discussion of qualitative merits of quotations other than transcription of the adjectival assessment assigned to one of the offerors).

144.    Equally problematic, the documented tradeoff rationale fails to exhibit reasoned decision-making as necessary to withstand APA review because the rationale does not logically connect the SSA's earlier (individualized) findings regarding the quoters to the determination that CEC's quote warrants a price premium. *Motor Vehic. Mfg's Ass'n.*, 463 U.S. 29 at 43 ("the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made'") (internal citation omitted); *see also Dist. Sols., Inc.*, 106 Fed. Cl. at 24 ("Even though a lower threshold applies for a FAR Part 8 tradeoff analysis, the Court will analyze the CO's tradeoff decision to determine whether it is reasonable and within the agency's discretion.")

145.    More specifically, the SSA's tradeoff analysis disregards the DEA's finding that FYI, ███████████████████████████████████ (GAO AR Tab 10 (Part 3), Award Decision Memo. at PDF 35 ████████████████████████ ███████.)  This feature plainly exceeds the RFQ's requirements, which require the quoter to ████████████████████████████████████████ and commit the DEA to ██████████████████████████████████████████ ████████████████ (GAO AR Tab 4 (Part 2), RFQ Am. 1 at PDF 184 ██████████ ██████████████████████████████████████████ ████████████████████████ That the Agency considered quotes ████████ ████████████████████ of benefit is likewise apparent given its express finding that ████████████████████████████████████ (GAO AR Tab 10 (Part 3), Award Decision Memo. at PDF 34 ██████████████████████

████████████████████████████████████████

████████████████████████.)    As such, the DEA's own finding that FYI

███████████████████████████████ is a consideration that

any rational tradeoff analysis must have considered in determining best value. *Watts-Healy*

*Tibbitts A JV v. United States*, 82 Fed. Cl. 614, 615 (2008) ("the very definition of arbitrary and

capricious action is decision-making that ignores the relevant factors critical to the decision").

146.    The documented tradeoff rationale, however, tellingly does not mention this

evaluated ██████████████████████ and offers no indication that DEA even

considered it as part of its tradeoff analysis.

147.    In short, the DEA has ignored relevant information necessary to reach a sound

tradeoff conclusion.  As a result, not only has the DEA failed to articulate a "rational connection

between the facts found and the choice made," but it has provided an demonstrably lacking

explanation for its tradeoff conclusion. *Braseth Trucking, LLC v. United States*, 124 Fed. Cl. 498,

510 (2015) (requiring contracting officer to "provide an explanation for [an] exercise of discretion

that is coherent and not internally inconsistent" and remanding matter back to agency); *CliniComp*

*Int'l, Inc.*, 117 Fed. Cl. at 742 ("At the very least, the source selection authority (SSA) must provide

a coherent and reasonable explanation for its conclusions, even if those conclusions are technical

in nature") (citations omitted).    Indeed, while the SSA identified CEC's ███████████

████████████████ as an award discriminator for CEC, presumably because it █████████

████████████████, the SSA's own summary of the underlying evaluation tacitly

recognizes that FYI ████████████████████████████████████

████████

148.    To put a finer point on the issue, the DEA's tradeoff analysis recasts a ████████

████████████████████████████ This error on the face of the DEA's

tradeoff determination, which stems from the Agency's failure to meaningfully consider its own evaluation findings regarding FYI, further render the DEA's tradeoff and resulting best value determination arbitrary and capricious.

149.    The Agency's irrational tradeoff analysis prejudiced FYI.  Even without correcting the underlying evaluation errors, the Agency's tradeoff analysis would have looked different upon a rational tradeoff premised on a meaningful comparative analysis of the quoters' assessed merits. To illustrate, had the Agency properly considered FYI's ██████████████████████ ████████████████████████████████████████ the Agency certainly would not have recognized ████████████████████████████████ as a reason to pay *more* for CEC's higher-risk ████████ approach.  Had the Agency actually considered CEC's supposed ability to review applicant inquiries relative to the DEA's needs in the instant procurement or relative to what FYI offered, the Agency may well have determined that CEC's supposed capability does not warrant any price premium.  In all events, given the RFQ's language that price will grow in importance as the technical differences between quotes narrow ((GAO AR Tab 4 (Part 2), RFQ Am. 1 at PDF 185), any recognition by the Agency that CEC's supposed advantages do not in fact constitute discriminators over FYI would have tilted the tradeoff analysis in favor of FYI's comparably rated, lower-price quote.

### B.    The Agency's Underlying Evaluation Errors Further Render The Best Value Determination Arbitrary And Capricious.

150.    Even if the Agency had conducted a proper tradeoff analysis (which it did not), its resulting best value determination also is arbitrary and capricious given the numerous evaluation errors underlying it.

████████████████████████████████████████████

151.    A flawed underlying evaluation cannot serve as the basis for a rational source selection decision. *Lab. Corp. of Am. Holdings,* 116 Fed. at 653 (best value tradeoff decision was unreasonable when based upon irrational technical evaluation); *see also Gen. Dynamics Info. Tech., Inc.*, B-421290, Mar. 1, 2023, 2023 CPD ¶ 60 (sustaining best value protest given unreasonable underlying evaluation); *AttainX, Inc.*, B-421216, Jan. 23, 2023, 2023 CPD ¶ 45 (sustaining protest and recommending the Agency make a new award determination where GAO sustained technical and price evaluations protests).

152.    Here, the DEA record evinces numerous prejudicial errors in the DEA's evaluation of FYI and CEC under each of the non-price Factors.  Relative to Factor 1, the Agency errantly attributed two award discriminators to CEC that do not in fact constitute advantages over FYI.  To the contrary, one of the supposed benefits (CEC's supposed ability to surge reviews to 28,000 per week) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and in any event does not exceed any RFQ metric, and the other (CEC's use of transition dashboards) ▮▮▮▮▮▮▮▮▮ because, as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The DEA further obscured FYI's relative advantages by subjecting the quoters to a disparate evaluation standard and crediting CEC for quote features that FYI also provided (or provided a superior feature).

153.    Relative to Factor 2 (Transition Phase-In/Transition Phase-Out), the DEA departed from the RFQ's requirements by failing to distinguish the quoters on their relative merits.  As a result, the DEA evaluators treated CEC and FYI as equivalent despite that CEC merely proposed to meet the RFQ transition requirements while FYI committed to substantially exceed them, including by ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ Equally problematic, the Agency continued its unequal treatment of CEC and FYI

under Factor 2 by assessing evaluation strengths to CEC quote features without doing the same for almost identical or even superior features of FYI's approach.

154.    Relative to Factor 3 (Past Performance), the Agency misevaluated FYI by errantly disregarding FYI's incumbent CPAR materials and the highly pertinent ████████████ information regarding FYI's performance therein.   Conversely, the Agency overevaluated the ████████████ of CEC's past performance despite that it is FYI that ████████████ ████████████

155.    A best value determination premised on underlying errors necessarily fails and must give way to a reevaluation consistent with the RFQ and the law.  *Kropp Holdings, Inc. v. United States*, 176 Fed. Cl. at 559-60 (setting aside best value determination because it "was a cumulative determination that relied on flawed ratings," rendering the best value determination itself flawed).

156.    Therefore, given the foregoing reasons, the Court should (a) declare DEA's best value determination arbitrary, capricious, an abuse of discretion, (b) declare that DEA should conduct a new source selection decision consistent with the RFQ and procurement law; and (c) preliminarily and permanently enjoin the DEA from performing the contract awarded to CEC unless and until the DEA corrects its flawed best value determination and underlying evaluation.

## FYI IS ENTITLED TO INJUNCTIVE RELIEF

157.    This Court has authority to "award any relief that the court considers proper, including declaratory and injunctive relief."  28 U.S.C. § 1491(b)(2).

158.    In deciding whether to issue a permanent injunction, the Court considers four factors: (1) whether the plaintiff has succeeded on the merits; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest

to grant injunctive relief. *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) (citing *Amoco Prod. Co. v. Vill of Gambell, Alaska*, 480 U.S. 531 (1987) (stating further that the "standard for a preliminary injunction is essentially the same as it is for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success")).

159.    Each of the four factors weigh in favor of granting FYI injunctive relief. First, as explained above, FYI is likely to succeed on each of its Counts.

160.    Second, absent injunctive relief, FYI will lose the opportunity to compete fairly for the RFQ and instead will be subject to a procurement process that does not comport with the Solicitation and the law. This constitutes irreparable harm under this Court's established standard. *See, e.g.*, *22nd Century Techs., Inc. v. United States*, 176 Fed. Cl. 389, 401 (2025) ("it is well established that loss of an opportunity to compete fairly for a contract constitutes irreparable harm"). Further, and relatedly, absent injunctive relief, FYI will lose potential revenue and profits associated with the solicited effort. *Cardinal Maint. Serv., Inc. v. United States*, 63 Fed. Cl. 98, 110 (2004) ("Irreparable injury includes, but is not limited to, lost profits which would flow from the contract."). Such loss is particularly acute in FYI's case because FYI has supported the Agency on the incumbent effort since 2015, and ███████████████████████████████████ ████████.

161.    Third, the balance of harms tips in FYI's favor. Contrary to the concrete irreparable injuries that FYI will suffer, the Agency will suffer no meaningful harm. Requiring the Agency to make award in line with the RFQ and procurement law will result in the selection of a vendor based on the criteria that the Agency crafted consistent with its best interests. Moreover, to the extent the Agency claims any procurement delay as a result of an injunction, any such alleged

delay is a self-inflicted injury based on the Agency's failure to act in accordance with the law.  *See e.g., ARxIUM, Inc. v. United States*, 136 Fed. Cl. 188, 209 (2018) (granting injunctive relief and stating, "much of the prospective harm identified by the government . . . is the result of the government's own delays and procurement errors, for which it cannot be credited") (citation omitted).

162.    Lastly, the public interest favors an injunction in this case to remedy the procurement errors described herein.  These have individually and collectively compromised the procurement and resulted in the selection of a technically inferior proposal at a price premium.  *See, e.g., United Intern. Investigative Servs., Inc. v. United States*, 41 Fed. Cl. 312, 323 (1998) (noting that the public has an interest in minimizing the costs of federal procurements and a "strong interest" in preserving the integrity of the procurement process) (citations omitted).  Thus, where, as here, the Agency fails to equally and reasonably evaluate the quoters in line with the RFQ and the law, an injunction against the Agency's arbitrary and capricious conduct is the only way to advance the public interest in safeguarding the integrity of the of the procurement.  *PCI/RCI v. United States*, 36 Fed. Cl. 761, 776 (1996).

## PRAYER FOR RELIEF

WHEREFORE, FYI prays that this Court:

a.    Declare the underlying evaluations of FYI and CEC, the best value determination, and the award decision to CEC arbitrary and capricious, an abuse of discretion, or otherwise contrary to law;

b.    Issue preliminary and permanent injunctions enjoining CEC from performing the contract and requiring the DEA to terminate the BPA award to CEC and make a new award decision consistent with the RFQ and the law; and

b.    Provide such other and further relief as the Court deems just and proper.

Dated:   January 9, 2026                    Respectfully submitted,

                                            ARNOLD & PORTER KAYE SCHOLER LLP

*Of Counsel*:

                                            /s/ Craig A. Holman
Roee Talmor                                 Craig A. Holman
Arnold & Porter Kaye Scholer LLP            601 Massachusetts Ave., N.W.
601 Massachusetts Ave., N.W.                Washington, D.C. 20001
Washington, D.C. 20001                      Phone: 202-942-5722
Phone: 202-942-6461                         Fax:  202-942-5999

                                            *Counsel to FYI – For Your Information, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of January 2026, I caused a true and correct copy of

the foregoing Sealed Bid Protest Complaint to be served by electronic delivery on:

Douglas K. Mickle
Acting Deputy Director
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
PO Box 480
Ben Franklin Station
Washington, D.C.  20044
douglas.mickle@usdoj.gov
*Counsel for Defendant*


/s/ Craig A. Holman